IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.: 12-21984-CIV KING/MCALILEY

BEDAT & CO GENEVE, a company organized
under the laws of Switzerland,

    Plaintiff,

vs.

LUXURY MONTRES, LLC, a Florida limited
liability company,

    Defendant.
_____/

## **LUXURY MONTRES, LLC's RESPONSE TO BEDAT'S MOTION FOR JUDGMENT AS A MATTER OF LAW, OR, IN THE ALTERNATIVE, FOR A NEW TRIAL**

Defendant/Counter-Plaintiff, LUXURY MONTRES, LLC, ("LM") through undersigned counsel, hereby responds to Plaintiff/Counter-Defendant, BEDAT & CO GENEVE's ("Bedat") Motion for Judgment as a Matter of Law, or, in the alternative, for a New Trial (ECF No. 100) and states:

### **Introduction**

Bedat's motion is simply a rehash of the arguments at trial made at the close of the evidence which the Court, having all of the evidence fresh for consideration, denied. The entire argument boils down to Bedat's claim that the Court should ignore the evidence at trial proving Bedat breached the contract in a grossly negligent and willful manner which damaged LM. Despite the rule of law that Bedat's burden is to accept the evidence in the light most favorable

to LM, Bedat instead chooses to argue evidence in a light most favorable to its own interpretations.[1] Bedat also ignores the applicable law which is adverse to its position.

Bedat's core argument is that the contract states a strict paper procedure by which LM"s orders for watches had to be "accepted" by Bedat before it had any obligation to deliver product. Based on this interpretation of the contract, Bedat then asserts that since no such "formal acceptance" of LM"s orders was put into evidence, therefore Bedat cannot be liable for breaching the contract as a matter of law. Bedat chooses to ignore all the evidence at trial that the "contractual provisions for acceptance" were not followed from the beginning, that there was no single system used by the parties for acceptance of orders, and that Bedat promised to deliver the products LM's ordered despite no "pro forma invoices". Finally, Bedat argues that there was insufficient proof of causation of damages and of the amount of damages, despite the voluminous amount of detailed, specific past lost profits proven and the unrebutted testimony of LM's witnesses regarding the canceled sales due directly to Bedat's failure to deliver product.

Bedat is simply renewing its closing argument, hoping this Court will overrule the jury and accept Bedat's version of the evidence. Using circuitous logic regarding the facts, avoiding the actual evidence presented at trial, applying the applicable legal principles erroneously, and ignoring the applicable standards of review, Bedat essentially seeks to have this Court reject the jury's discretionary verdict based on the evidence at trial. Bedat's position is without merit. The jury's verdict should be upheld.

## Standard of Review

The standards of review under Rule 50(b) and Rule 59 are as follows, to wit:

---

[1] Indeed, Bedat offers its interpretations of the contract **without any such evidence existing at trial.** Bedat chose to not put on any witnesses and its cross examinations of LM"s witnesses never elicited the contractual interpretations Bedat is now advancing.

2

Under Rule 50(b), "this Court must consider the evidence presented at trial, drawing all factual inferences and resolving all credibility determinations in favor of the nonmoving party. Judgment as a matter of law is appropriate only if the evidence is so overwhelming in favor of the moving party that a reasonable jury could not arrive at a contrary verdict." *Transamerica Leasing Inc v. Inst. Of London Underwriters,* 338 F. Supp. 2d 1299, 1303 (S.D. Fla. 2004). The Court "must affirm the jury verdict unless there is no legal basis upon which the jury could have found for the plaintiff." *Telecom Tech Servs. Inc. v. Rolm Co.,* 388 F. 3rd 820, 830 (11th Cir. 2004).

Furthermore, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 US 133, 151 (2000).

Under Rule 59, "[A] trial judge may grant a motion for new trial if he believes the verdict rendered by the jury to be contrary to the great weight of the evidence. ….to grant the motion, he must find the verdict contrary to the great, not merely the greater, weight of the evidence." *Smart v. City of Miami Beach,* 933 F. Supp. 2d 1366, 1372 (S.D. Fla. 2013).

**The Parties did Business in the Real World: Bedat's Reliance on a Strict Construction of the Contract Regarding Acceptance of LM's Orders is Not Supported by the Evidence**

Bedat's entire argument centers around its claim that the contract unambiguously provides for a paperwork system that must be complied with before Bedat can be held to have "accepted" any order from LM. According to Bedat, since there was no proof at trial that Bedat accepted all of the products LM ordered by the method contained in the contract, Bedat therefore cannot be legally responsible for failing to deliver product. Bedat wants this Court to rule as a

3

matter of law that Bedat is excused from any liability for its failure to deliver goods because the paper system contained in the contract was not followed.

This argument completely ignores the unrebutted evidence[2] at trial proving that Bedat itself never followed this "contractual" paperwork system instead doing business with LM <u>from the beginning</u> without requiring such technical compliance with these "paper" requirements. . (S. Wizman, Day 2 Tr 85:7-14)  Indeed, there is no evidence in the record from any source supporting Bedat's argument that it required these provisions of the contract be complied with. Thus Bedat ignores the law that merchants waive or are considered to have modified contractual requirements when they have followed a course or method of dealing with each other different from the strict interpretation of the contract.  When this occurs and neither raises the contractual requirements, such contractual requirements are deemed modified or waived by the course of conduct. UCC § 2-209 (2013)

The evidence at trial showed that starting with the initial order placed by LM at the end of March of 2010, Bedat verbally, and in writing, "accepted" the order. (J. Wizman testimony, Day 2 of Trial at 86:6-9)  Indeed, on May 5, 2010, Bedat **wrote** to LM stating that <u>everything</u> LM had ordered for 2010 would be delivered by "early July. **It's done. U will get it. For sure.**", (Ex. 13 – emphasis added).  It is undisputed that Bedat broke this promise; that LM did not get even half of its order by that date and that even by the end of 2010, had still only received approximately two thirds of its order.  LM never received almost a million dollars worth of expensive gold watches.  On this evidence alone, Bedat's motion fails completely.  The jury was free to accept this evidence regarding the course of dealing, the promises (in writing) made regarding delivery, and the breach of these promises in rendering a verdict for LM.

---

[2] Bedat did not call any witnesses at trial and offered no evidence whatsoever to support its argument now that Bedat required certain paperwork before it had to deliver goods.

4

Bedat then argues in its motion that this admission is not valid because the email did not have the contractually required "pro forma invoices" attached to it and thus the email is not an acceptance of the order. Bedat's position is spurious as it uses circuitous logic which would make a complete mockery of the law of modification and waiver. Bedat had the right to accept orders from LM in a manner different from the strict requirements written in the contract and Bedat did so. This entire argument fails as a matter of law.

Furthermore, the evidence proved that Bedat admitted, in writing, that it had problems with production, apologized for the breach of its promises regarding delivery, and even admitted its own negligence regarding the production and delivery of product LM had ordered. (Ex. 13) LM presented other evidence at trial that was never rebutted that Bedat advised LM at the end of 2010 that certain key luxury gold watches LM had ordered had been discontinued despite Bedat's prior promises to deliver these gold products. (J. Wizman, Day 1 Tr.) LM long after learned that Bedat had lied to LM and these gold watches were not discontinued but rather had been diverted by Bedat to its own territory in the Orient resulting in far greater profits to Bedat than if delivered to LM. (J. Wizman, Day 1 Tr.)

In other words, the evidence at trial proved that Bedat was not only grossly negligent, but guilty of willful misconduct, resulting in significant financial losses to LM.

Bedat argues there was no evidence of any modification or waiver. Bedat is simply ignoring the testimony and written evidence regarding the method by which the parties actually did business. Bedat wishes to avoid the standard of review that the evidence, and all inferences from the evidence, should be taken in a light most favorable to LM, not to Bedat. For example, Bedat quotes one portion of Johnny Wizman's testimony where he states that "there was no magic form" that had to be used to make an order, that LM would get confirmation from Bedat

5

thereafter (J. Wizman, Day 1 Tr. 14:2-13). Bedat argues that this proves the contractual system was being followed but the more reasonable interpretation, let alone the one most favorable to LM, is that the contractually required system of paperwork was not being followed. As testified to, there was **no** "magic" form that had to be used.

Bedat then claims that Wizman admits that "pro forma invoices" had to be used but an examination of the testimony merely shows that this type of document was sometimes used, but not always, to wit: "Q. And what did you get back from them? A. We would get back a confirmation that they received our order, **or** we would even get a pro formal invoice, as well, telling us what was available." (J. Wizman, Day 1 Tr. 14:2-13)

This evidence does not prove Bedat's position that only after a "pro forma invoice" was sent by Bedat was the company accepting an order. On the contrary, the testimony proves that there was no single system in place. In the quoted testimony above, Wizman's use of the disjunctive, "or", negates Bedat's conclusion. Wizman testified at trial there was not "any one specific system" nor any specific "magic" form used by Bedat to confirm orders." (Day 2 Tr, 85:7-14) Though Bedat admits this testimony later in its motion (ECF 100, p. 13), Bedat nevertheless wants the Court to ignore the evidence and its obvious meaning.

The rule of law being that all facts and inferences from the evidence are to be taken in a light most favorable to LM defeats Bedat's entire argument.

**Bedat's Written Admissions: Bedat's Emails Confirm Acceptance of LM's Orders and Made Promises Regarding Delivery of Product which Promises were Ultimately Broken**

Bedat argues that its written emails promising delivery of product by certain deadlines are not admissions that Bedat accepted LM's orders. Bedat claims that because a "Pro Forma Invoice" was not attached to the email, therefore it is not an "acceptance of the order. Bedat's

6

argument is circuitous logic; the argument lacks validity. In other words, without any testimony supporting this conclusion, Bedat today asks the Court to ignore Bedat's own undisputed admissions, in writing, based solely on Bedat's current legal arguments in its motion. There is no basis in the law for such a disregard for the evidence at trial. Moreover, as shown above, the admissions support LM's position and the jury's verdict thereon.

In the May 2010 email (Ex. 13), Bedat promises delivery of all ordered product by early July. No mention is made of any contractual requirement of paper confirmations or "pro forma invoices" Bedat is thus now attempting to have a "second bite at the apple" in its motion, seeking to have this Court reweigh all this evidence and come to a conclusion contrary to the jury's verdict. Bedat offers no legal basis for such a usurpation of the jury's role in our system of justice nor does Bedat provide the Court with any evidentiary basis from which to draw these conclusions. As a final matter, Bedat's position is directly contrary to the standard of review whereby all facts and inferences are to be taken in a light most favorable to LM.

In another written admission of Bedat's promise to deliver ordered product, sent after Bedat breached its promise to deliver all product by "early July," in September of 2010, Bedat provided a schedule of delivery of product on a month by month basis for September through December of 2010 (Ex. 52). Again, no mention was made of any required paperwork before such orders were "accepted" nor was there any other condition to the promise. Despite this new promise, Bedat again breached by failing to deliver by the already late delivery dates. The jury was free to interpret these admissions by Bedat in a reasonable manner and did so, rejecting Bedat's tortured interpretations and arguments regarding this evidence.

On this issue, Bedat confuses contract law in arguing the principles of offer and acceptance. The legal principles Bedat refers to apply to the formation of a contract, not to the

7

method by which businesses accept orders for good pursuant to a formed contract. Accordingly, notwithstanding Bedat's failure to apply the evidence to this issue properly, Bedat's legal argument relies on inapplicable law. Bedat's arguments on this issue should be rejected.

### Sufficient Evidence of Gross Negligence and Willful Misconduct Was Proven

Again ignoring the evidence at trial, Bedat claims it cannot be liable claiming no evidence existed of gross negligence or willful misconduct (the contract provided that Bedat would not be liable "for late or incomplete deliveries, except in cases of gross negligence or willful misconduct") (Ex. 1, Exclusive Distribution Agreement, § 4.1). Though Bedat correctly states Florida law that gross negligence is more than merely a breach of contract and rises to the level of a 'conscious, voluntary act or omission....which is likely to result in injury. (ECF 100, p.16 citing to *Central State Transit & Leasing Corp. v. Jones Boat Yard*, 206 F. 3d 1373, 1377 (11th Cir. 2000), Bedat fails to acknowledge the large amount of evidence supporting the conclusion that Bedat consciously breached the agreement knowing that LM would be damaged thereby.

In the case at bar, LM provided evidence at trial that Bedat accepted orders knowing it would never be delivering product, knowing that it would never be able to deliver much of the product timely, and knowing that LM would be damaged thereby in its relations with its retailers. Worse, Bedat thereafter repeatedly made promises that delivery would be forthcoming "for sure" during the window of opportunity whereby orders must be delivered.[3] Finally, LM established by unrebutted evidence that Bedat promised to deliver high end, expensive luxury gold watches, breached these promises, then advised that the watches had been discontinued when in fact this representation was false. Long after, LM later learned that these excuses from Bedat were

---

[3] LM's witnesses explained that in America, orders placed in March must be filled and delivery occurring by the end of summer so that the retailers can have the displays ready for the critical fall season through middle of December.

8

knowingly false when LM's witness saw the "discontinued" gold watches for sale in the Orient, a territory which Bedat sold directly thus making substantially more profit than if it had delivered the watches to LM. In other words, evidence was provided at trial that Bedat had diverted watches LM was entitled to and had been promised. (J. Wizman, Day 1 Tr.) The unrebutted evidence that Bedat lied to LM about why these watches were not being delivered to LM is evidence of willful misconduct.

Again, having chosen to not present any witnesses at trial, Bedat's claim that no evidence of gross negligence or willful misconduct existed in the record is spurious.

**Bedat's Claim of Estoppel or Waiver by LM of the Right to Lost Profits for Failing to Give Notice of the Claim at the Time the Breach Occurred is Without Legal or Factual Basis**

Initially, it must be noted that Bedat makes improper factual claims regarding the timing of LM's notice of breach in an effort to make it seem that LM "sat on its rights". Bedat states that LM claimed "years later that Bedat breached the Contract" yet the evidence at trial was overwhelming that LM was complaining to Bedat of its failures to deliver product timely almost from the beginning of the business relationship. The entire time in which these companies did business was only two years and two months.[4] Even assuming arguendo that LM did not initially complain to Bedat concerning its failure to deliver product, Bedat's initial breach of the contract essentially occurred in August of 2010 and continued through the end of that year. In response to Bedat's notice of termination in May of 2012 for LM's alleged breach of the agreement which had been occurring since 2010, LM's counsel formally put Bedat on notice of LM's claims for lost profits and damages. In other words, using the most expansive time frame from breach to assertion of rights, only fifteen months passed. This is not "years" as Bedat

---

[4] The companies began doing business at the end of February, 2010 and Bedat unilaterally declared a termination of the contract in May of 2012.

9

attempts to imply. Moreover, as Bedat continued to breach the contract throughout the time the companies did business, the breaches in 2011 were only months before the formal notice. Bedat's position is factually flawed.

Additionally, it would be duplicitous of Bedat to claim it had a right to unilaterally terminate this contract for LM's failure to pay off its credit line, a breach of the agreement according to Bedat that had existed for almost two years, yet at the same time raise as a shield the claim that LM had waived its right to seek lost profits for breaches by Bedat that had occurred just slightly more than a year before at most. Moreover, as the evidence established, it was not until almost the end of the contract that LM learned of Bedat's lies regarding the almost $1 million worth of gold watches that Bedat had never delivered back in 2010 which it had falsely claimed had been discontinued. Thus LM had not even been aware of Bedat's false claims and willful misconduct until almost the end of the relationship. One cannot waive one's rights without knowledge of the wrongdoing. Bedat's argument on this point lacks validity.

Another point is that this contract expressly provides that "Each party is required to continue to perform its obligations under the Agreement, pending final resolution of any dispute, controversy or claim concerning or relating to the Agreement" (Ex. 1, Exclusive Distribution Agreement, §17). As LM's principals testified at trial, they continued to operate in good faith, despite complaining to Bedat about its breaches of the agreement, in attempting to honor their contractual obligations, and in an effort to work out the problems together as honorable businessmen. (J. Wizman, Day 1 Tr.; S. Wizman, Day 2 Tr)

Finally, Bedat's claim that LM waived its right to assert these claims is without evidentiary support. LM did complain to Bedat about the losses LM had suffered. (J. Wizman, Day 1 Tr.) Bedat was well aware of LM's claims regarding Bedat's failures to deliver product.

10

Moreover, there is insufficient evidence in this trial from which to rule, as a matter of law, that the relatively brief passage of time in this case before claims were formally made resulted in a knowing waiver of one's rights.

## LM Provided Sufficient Evidence of Lost Profits

Bedat boldly claims that LM failed to prove that Bedat's actions caused the damages sought or that the amount of damages were able to be calculated by some reasonable standard. On the contrary, LM offered extensive evidence proving the orders taken, the sales made, the orders Bedat failed to properly fill, the actual cancellations and how much profit meaning money after all expenses were lost in the past. The testimony and evidence on this issue was straightforward.

LM needed product delivered by the end of summer so that its customers (retail outlets such as Neiman Marcus, Bergdorf Goodman, Mayors, etc.) would be able to display the product during the critical fall sales season. (J. Wizman, Day 1 Tr.) Bedat failed to deliver the product timely and some of LM's customers canceled their orders. (J. Wizman, Day 1 Tr.) LM's history of sales for orders filled was virtually 100% meaning that almost all orders filled ended up being actual sales. (J. Wizman, Day 1 Tr.) Accordingly, LM thus lost the revenue from actual orders that it could never fill because Bedat breached the agreement.

The undisputed evidence at trial was that LM's profit margin, after all expenses, was a simple percentage and thus the determination of lost profits in the past was a mathematical calculation based on lost orders multiplied by the profit margin. This evidence was unrebutted.

Bedat fails to acknowledge that LM provided detailed evidence at trial of its actual revenues received, its actual expenses, and of each order that was canceled (the name of the retail customer and the exact amount of the canceled order). Much of the detailed evidence was

literally to the penny and the amounts were broken down by year (partial of 2010, all of 2011 and partial of 2012). (Ex. 7C; 8C)

From total sales over the approximately two year period of $9,290,890, LM provided unrebutted proof of cancelations of actual sales due to Bedat's breach totaling $4,697,744 which resulted in actual lost profits for the past totaling exactly $1,442,208 after all expenses. The jury, in its discretion, determined that that the damages for lost profits were less, awarding $846,210.29 in lost profits. (Ex. 7C; 8C)

Bedat then argues that LM did not prove that Bedat's actions caused the damage. Bedat argues that it proved examples of some deliveries not made by Bedat due to its refusal to deliver without payment, the overwhelming amount of evidence of Bedat's gross negligence and willful misconduct in 2010 alone causing more damage than actually awarded by the jury for lost profits defeats Bedat's argument that there was "no evidence" of cancellations due to Bedat's breaches of the agreement. The jury was free to make its determination based on the evidence presented given the amount of undisputed evidence that Bedat breached the agreement and LM lost sales directly thereby.

Bedat argues that other methods of proof would have been better. Even if so, LM was still at liberty to present its case and did so in a method acceptable pursuant to Florida law. Furthermore, Bedat chose to not present any evidence rebutting LM's evidence of lost profits. Accordingly, just like all of its other arguments in its motion for judgment as a matter of law or new trial, Bedat is simply making another "closing argument" as opposed to providing a legal basis for its claims. Bedat is unhappy that the jury rejected its arguments, but a jury is legally empowered to so reject one side's arguments. Provided adequate evidence exists in the record to support a verdict, the jury's determination will not be disturbed. As shown herein, the jury's

verdict is well supported by not just competent evidence and by not merely the greater weight of the evidence, this verdict is based on the overwhelming evidence in this case.

Bedat's final argument is that LM"s summary of damages was prepared in part by a forensic accountant who Bedat disingenuously claims was not subject to discovery. What transpired was that due to disclosure within the Court's pre-trial order deadlines but on the final day of deadline, rather than take the accountant's deposition, Bedat chose instead to seek to preclude the accountant from testifying and to have LM"s future lost profits stricken. (ECF 29)Bedat was successful in persuading the then trial judge, the Honorable James King, to so strike the witness and the future claimed damages. (ECF 47)   Accordingly, Bedat elected its remedy and should not be heard from regarding any complaint now that it voluntarily chose not to depose this accountant.

Moreover, this is a proverbial "red herring" argument because a party may certainly present evidence to a jury of its revenues, expenses and create a demonstrative exhibit presenting a summary of the underlying data and the mathematics regarding how the party calculated lost profits without having to put on every witness that participated in the analysis. Rule 1006, Summaries to Prove Content, Fed. R. Evidence (2013)  In the case at bar, the exhibit had been disclosed to Bedat more than six months prior to this trial.  No objection was ever raised to the methodology or the underlying data.  At trial, LM's witnesses testified that they participated in the creation of the data and the summary and that the information contained therein was true and correct.  (J. Wizman, Day 1 Tr.; S. Wizman, Day 2 Tr; Ex. 7C; 8C)  This foundation created a legal basis upon which to admit the summary.  Rule 1006, Summaries to Prove Content, Fed. R. Evidence (2013).

13

Bedat points out its claims that there was evidence that some cancelations would have occurred no matter what. As this Court is well aware, a jury is free to reject such evidence or accept such evidence as the jury sees fit in its discretion. In the case at bar, LM only recovered from the jury approximately sixty (60%) percent of the past lost profits it sought and thus Bedat's arguments that no lost profits should have been awarded is legally and factually flawed.

## Conclusion

Bedat's position is without factual support or legal basis. The verdict and final judgment should be upheld.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of January, 2014 a true copy of this document was filed electronically with the Clerk of Court using the CM/ECF system which will send notice to Richard J. Ovelman, Esquire of Jordan Burt and Andrew T. Solomon, Esquire of Sullivan and Worcester LLP, 1633 Broadway, 32nd Floor, New York, New York, 10019.

Respectfully submitted,

SCOTT JAY FEDER, P.A.
**Attorneys for Defendant**
4649 Ponce De Leon Blvd., Suite 402
Coral Gables, Florida 33146
Tel: (305) 669-0060 / Fax: (305) 669-4220

By: ___/S/_____
SCOTT JAY FEDER, ESQ.
Florida Bar No. 359300
Scottj8@aol.com